BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: TRANS UNION, LLC DATA SECURITY BREACH LITIGATION | MDL No. _____ |

**MEMORANDUM IN SUPPORT OF MOTION
OF DEFENDANTS TRANS UNION, LLC AND TRANSUNION
FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Defendants Trans Union, LLC and TransUnion (collectively, "TransUnion" or the "Company") respectfully submit this Memorandum in Support of Its Motion for Transfer and Centralization of the 54 federal cases listed in the Schedule of Actions attached hereto ("TransUnion Actions" or "Actions"), and any subsequently filed "tag-along" actions, to the U.S. District Court for the Northern District of Illinois.

**INTRODUCTION**

The Actions are textbook examples of cases appropriate for consolidation and transfer under 28 U.S.C. § 1407. These overlapping putative class actions, now pending in various federal district courts, all stem from a single alleged data incident involving unauthorized access to certain information belonging to consumers who contacted TransUnion. Each Action asserts substantially similar claims and is predicated on a common nucleus of operative facts. Central to all are shared factual questions regarding the nature and execution of the social engineering attack, the categories of information purportedly compromised, the adequacy of TransUnion's data security measures, and the Company's response to the incident. Consequently, discovery in these Actions will necessarily involve the same witnesses—both fact and expert—and will require courts to oversee duplicative and potentially inconsistent discovery proceedings.

Consolidation and transfer are thus not only appropriate, but essential to promote judicial efficiency, avoid conflicting rulings, and ensure the just and consistent resolution of these related matters.

The Northern District of Illinois stands as the most suitable and logical forum for the transfer and centralization of these Actions. The vast majority of cases against TransUnion have been filed in this District, and TransUnion's headquarters is located in Chicago. Many key witnesses, including TransUnion's employees, are based in Chicago.

The Panel should accordingly grant TransUnion's motion for centralization of the TransUnion Actions in the Northern District of Illinois.

## BACKGROUND

**A.    Data Incidents at Issue.**

TransUnion is one of the leading credit reporting agencies in the U.S. with its principal place of business in Chicago, Illinois. On July 28 and 29, 2025, TransUnion experienced a data incident via a social engineering attack whereby threat actors posed as help desk technicians to gain limited access to a discrete segment of the Company's Salesforce environment (the "Data Incident").[1] Upon discovery, TransUnion contained the threat actor's ability to access the Salesforce environment, initiated an investigation involving third-party experts, and reported the incident to law enforcement. The unauthorized access was limited to the Salesforce environment and did not involve access to any credit databases. The threat actor was able, however, to access

---

[1] Salesforce is a company that specializes in cloud-based storage for sensitive data, as well as other software products for sales, customer service, marketing automation, e-commerce, analytics, artificial intelligence, and application development. Salesforce sells its software services to companies like TransUnion who store information using its software. Salesforce provides a third-party application that supports TransUnion's U.S. consumer-support operations (the "Salesforce environment").

personal information certain consumers provided to TransUnion. On August 26, 2025, after undertaking a comprehensive review of the affected data, TransUnion began sending formal notices to affected individuals.

**B.     Status and Nature of the Actions.**

On August 28, 2025, within days of public disclosure of the Data Incident, certain plaintiffs filed the first class action complaints in the Northern District of Illinois against TransUnion relating to the Data Incident. *See Snelgrove v. TransUnion, LLC*, No. 1:25-cv-10320 (N.D. Ill. filed Aug. 28, 2025) ("*Snelgrove*"); *Ihrke v. TransUnion, LLC*, No. 1:25-cv-10321 (N.D. Ill. filed Aug. 28, 2025). In the days that followed, no fewer than 52 additional putative class action complaints were filed in federal courts around the country, each asserting nearly identical claims from the same incident.

At present, the vast majority of actions naming only TransUnion as a defendant—42 in total—are pending in the Northern District of Illinois.[2] Other such actions naming only TransUnion as a defendant are pending elsewhere, including one in the Northern District of Florida, one in the Northern District of California, and another in the Eastern District of Pennsylvania.[3] Beyond these, the litigation landscape includes: (i) one action in the Northern District of Illinois naming both TransUnion and Salesforce as defendants; (ii) five actions in the Northern District of California naming both TransUnion and Salesforce as defendants; (iii) two actions in the same district naming TransUnion, Salesforce, and additional businesses as

---

[2]     A full list of cases is included in the Schedule of Actions.

[3]     There were previously two cases pending in the Eastern District of Pennsylvania, but one of the cases, *Alexander v. TransUnion, LLC*, No. 1:25-cv-11552 (N.D. Ill.), was transferred to the Northern District of Illinois after Judge Mary Kay Costello issued an order to show cause as to why venue was proper in Pennsylvania, leading the plaintiff to file a notice of consent to transfer the case to the Northern District of Illinois that same day. *See Alexander v. TransUnion, LLC*, No. 2:25-cv-05265 (E.D. Pa. 2025), Dkt. Nos. 7-9.

3

defendants; and (iv) a further action in the Central District of California naming TransUnion, Salesforce, and other parties as defendants.[4] There is also a single related action seeking individual relief currently pending in Florida state court, which TransUnion intends to remove to federal court, along with any other future state court actions related to the Data Incident.[5]

Given the volume and cadence of complaints already filed arising from the Data Incident, it is highly probable that more actions will be filed against TransUnion in the near term.

All of the Actions, including those naming TransUnion and other defendants, allege substantially identical facts surrounding the Data Incident. *Compare* First Amended Complaint ¶¶ 1-2, *Snelgrove v. TransUnion, LLC*, No. 1:25-cv-10320 (N.D. Ill. Sept. 18, 2025), Dkt. No. 12 (TransUnion-only complaint alleging that the suit arises from TransUnion's purported "failure to properly secure and safeguard Representative Plaintiffs' and, at least, 4.4 million other Class Members' personally identifiable information stored within Defendant's information network, including, without limitation, Social Security Numbers" that resulted from a "cyberattack purportedly discovered by Defendant (the 'Data Breach') on or around July 30, 2025"), *with* Complaint ¶ 46, *Acosta v. Salesforce, Inc. et al.*, No. 3:25-cv-07888 (N.D. Cal. filed Sept. 16, 2025), Dkt. No. 1 (complaint naming TransUnion, Salesforce, Allianz, and Farmers Group, alleging that "on July 28-30, 2025, TransUnion experienced a data breach that

---

[4]   As explained *infra* Argument § B, the claims against other defendants in the actions naming TransUnion, Salesforce, and/or other defendants in the complaint can be separated and remanded back to the Northern District of California pursuant to 28 U.S.C. § 1407(a).

[5]   *See Vitanyi v. Trans Union LLC*, No. 2025-CA-008943-O (Fla. 9th Jud. Cir. Ct., Orange Cnty., filed Sept. 13, 2025). The Panel has previously transferred individual actions removed from state court and asserted state law claims in MDLs concerning data breaches. *See* Transfer Order, *In re AT&T Inc. Customer Data Sec. Breach Litig.*, MDL No. 3114 (J.P.M.L. filed Oct. 4, 2024), Dkt. No. 256 (transferring eight individual actions seeking only individual relief that "concern[ed] the AT&T data breach announced in March 2024 and share common factual questions with the actions in the MDL").

publicly exposed Plaintiff and the class members' PII," "includ[ing] customers' names, dates of birth, and Social Security numbers").

With the exception of the single action discussed above seeking individual relief (*see supra* note 5), all of the actions encompass the same putative nationwide class and arise from the same underlying Data Incident. Nearly all assert parallel legal theories, including negligence, negligence per se, invasion of privacy, unjust enrichment, and breach of implied contract, and seek both declaratory and injunctive relief. Several actions also seek to certify a subclass of California citizens and assert claims under the California Consumer Privacy Act and the California Unfair Competition Law, but these, too, are grounded in the same core factual allegations concerning the Data Incident. [6]

**C.     The Separate Motion for Transfer and Consolidation In *In re Salesforce*.**

On August 29, 2025, plaintiffs in one of the actions against Salesforce moved the Panel to consolidate pending federal court actions against defendants, including TransUnion, in a hub-and-spoke MDL in the Northern District of California (the "*Salesforce* Motion"). *See* Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407, *In re Salesforce, Inc. Data Sec. Breach Litig.*, MDL No. 3164 (J.P.M.L. filed Aug. 29, 2025), Dkt. No. 1. TransUnion's response in opposition to the *Salesforce* Motion will be filed today, setting forth reasons why centralizing these Actions in a hub-and-spoke MDL with Salesforce in the Northern District of California would not advance the convenience of the parties and witnesses, nor would it promote the just and efficient resolution of the litigation.

---

[6]     One further action seeks to certify a subclass of New Jersey citizens and asserts claims under the New Jersey Consumer Fraud Act, similarly based on the allegations concerning the Data Incident. *See* Complaint ¶¶ 71, 139-140, *Selesnick v. TransUnion LLC*, No. 1:25-cv-11126 (N.D. Ill. filed Sept. 15, 2025), Dkt. No. 1.

5

As is detailed in TransUnion's opposition to the *Salesforce* Motion, the actions that plaintiffs seek to transfer and coordinate involve distinct defendants, separate data incidents occurring at different times, and different sets of data. Any purported factual overlap among the actions at issue in the *Salesforce* Motion is eclipsed by the unique issues presented by each defendant's unique experience. Moreover, the plaintiffs in the *Snelgrove* action similarly oppose the *Salesforce* Motion, arguing that "[t]he nucleus of facts regarding Salesforce's actions and omissions are factually disparate from the actions and omissions alleged against TransUnion" and that the "MDL treatment over TransUnion" sought in the *Salesforce* Motion "would be contrary to the goals of centralization due to the issues unique to the varied defendants."[7]

Accordingly, the *Salesforce* Motion should be denied.

## ARGUMENT

The Actions involve overlapping putative classes and complex factual allegations that relate to the same alleged data incident in which an unauthorized third party gained access to certain information consumers provided to TransUnion. Coordination of the Actions for pretrial proceedings pursuant to 28 U.S.C. § 1407 is appropriate to eliminate duplicative discovery, avoid conflicting pretrial rulings, conserve the resources of the judiciary, and otherwise promote the just and efficient resolution of these Actions. The presence of additional defendants in some of the Actions does not undercut the need for transfer because the claims against those defendants may be separated and remanded back to their transferor courts. Centralization is most appropriate in the Northern District of Illinois, which is not only where most of the Actions are pending, but also where TransUnion's headquarters is located.

---

[7] Plaintiffs Daniel Snelgrove et al.'s and Tina Ihrke et al.'s Response in Opposition to Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 at 4-5, 7, *In re Salesforce, Inc. Data Sec. Breach Litig.*, MDL No. 3164 (J.P.M.L. filed Sept. 24, 2025), Dkt. No. 70.

## A. The TransUnion Actions Are Appropriate for Transfer and Centralization Under 28 U.S.C. § 1407.

The Panel may transfer "civil actions involving one or more common questions of fact" that "are pending in different districts" to a single district "for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). Transfer is appropriate when (i) the civil actions involve "common questions of fact"; (ii) transfer will be "for the convenience of [the] parties and witnesses"; and (iii) transfer will "promote the just and efficient conduct of such actions." *Id.* The party seeking consolidation must show that transfer "will further the purposes of Section 1407." *In re Cable Tie Pat. Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980). Here, transfer to the Northern District of Illinois is appropriate because these criteria are easily met.

### 1. The Requirements of 28 U.S.C. § 1407 Are Satisfied.

#### (a) *The TransUnion Actions Involve Common Questions of Fact.*

Each of the Actions presents one or more common factual questions, as they all seek to certify similar classes of individuals who provided information to TransUnion, are based on similar allegations regarding the same Data Incident, and assert many of the same legal claims. The Panel has previously recognized that the existence of overlapping putative classes and shared allegations satisfies the "common questions of fact" requirement under Section 1407. *See In re Coinbase Customer Data Sec. Breach Litig.*, MDL No. 3153, 2025 WL 2326837, at *1 (J.P.M.L. Aug. 7, 2025) (coordinating "eleven actions pending in four districts" all brought by a putative classes consisting of "customers of Coinbase" regarding a "cybersecurity incident affecting Coinbase" that raised "common questions of fact, such as how and when the breach occurred, the sufficiency of Coinbase's data security practices, how and when Coinbase notified breach victims, and the nature of the alleged damages"); *In re First Nat'l Collection Bureau, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, 11 F. Supp. 3d 1353, 1354 (J.P.M.L. 2014)

(coordinating three class "actions[, which] share[d] factual questions relating to allegations that FNCB placed debt collection calls to plaintiffs' cellular telephones using an automated system, without the plaintiffs' consent").

The Panel also routinely grants motions to transfer and centralize cases involving data incidents brought against the same defendant. *See, e.g.*, *In re 23andMe, Inc., Customer Data Sec. Breach Litig.*, 730 F. Supp. 3d 1352, 1353 (J.P.M.L. 2024) (centralizing 31 actions pending in three districts against a genetic analysis company and its affiliates because "actions share common questions of fact arising from allegations that 23andMe failed to take adequate measures to prevent and mitigate the consequences of a 2023 data security breach that compromised the personally identifiable and genetic information of some seven million 23andMe customers"); *In re Schnuck Mkts., Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1380 (J.P.M.L. 2013) (centralizing four actions against a single defendant relating "to a data security breach in late-2012 through early-2013, concerning the personal and financial information of an estimated 2.4 million Schnucks grocery store customers").

Here, the Actions all involve substantially identical legal theories arising from the same alleged facts surrounding the Data Incident—i.e., an unauthorized actor's alleged access to information consumers provided to TransUnion—and all involve the same putative class of persons in the United States and putative subclasses of persons in various states across the country. *See In re Coinbase*, 2025 WL 2326837, at *1 (granting motion to transfer and centralize 11 actions pending in four districts where all of the "[p]laintiffs are customers of Coinbase, one of the world's largest cryptocurrency exchanges").

Moreover, each complaint raises common factual questions, including (i) the nature of the social engineering attack that caused the cybersecurity incident; (ii) the types of information

allegedly compromised; (iii) the adequacy of TransUnion's data security practices; and (iv) the Company's response to the incident. *See In re Blackbaud, Inc., Customer Data Sec. Breach Litig.*, 509 F. Supp. 3d 1362, 1363-64 (J.P.M.L. 2020) (granting motion to transfer and centralization in data breach involving one "[c]ommon defendant" where the "common factual questions include[d]: (1) Blackbaud's data security practices and whether the practices met industry standards; (2) how the unauthorized access occurred; (3) the extent of personal information affected by the breach; (4) when Blackbaud knew or should have known of the breach; [and] (5) the investigation into the breach"). Likewise, the Actions "assert virtually identical claims for negligence, invasion of privacy, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and violation of state consumer protection and privacy laws." *In re 23andMe, Inc.*, 730 F. Supp. 3d at 1353. The Actions will also involve the same or similar affirmative defenses, which further supports centralization. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 24 F. Supp. 3d 1366, 1367 (J.P.M.L. 2014) (centralization of two actions against the same defendant warranted where "both actions will involve similar defenses"; "Thus, it is likely that factual issues and discovery will overlap, particularly as to the definition of the relevant market(s) and the affirmative defenses.").

That certain actions also seek to certify California subclasses and assert state law claims does not weigh against consolidation and transfer. For example, in *In re 23andMe, Inc.*, certain plaintiffs opposed centralization in the Northern District of California, where the defendant was headquartered, because their cases purportedly raised "unique legal claims under the Illinois Genetic Information Privacy Act (GIPA) on behalf of Illinois classes and that those claims should be handled by an Illinois court." 730 F. Supp. 3d at 1353. The Panel found these arguments "not persuasive," and emphasized that "the Panel has made clear that 'the presence

of . . . differing legal theories is not significant where . . . the actions still arise from a common factual core.'" *Id.* (alterations in original) (citation omitted).

Accordingly, the first factor—whether the Actions present "common questions of fact"—is met.

> (b) *Transfer Will Promote the "Just and Efficient Conduct of These Actions."*

Transfer will promote the "just and efficient conduct of these actions" by avoiding duplicative discovery and obviating the need for multiple judges to rule on the same motions and avoiding inconsistent rulings on dispositive motions and class certification.

*First*, transfer will "eliminate duplicative discovery" and "conserve the resources of the parties, their counsel, and the judiciary." *In re Target Corp. Customer Data Sec. Breach Litig.*, 11 F. Supp. 3d 1338, 1338-39 (J.P.M.L. 2014) (transferring and centralizing 33 actions that all shared "factual questions arising from a data security breach at stores owned and operated by Target"). Because the allegations and claims in the Actions against TransUnion are all premised on the Data Incident, discovery in "all actions will focus on" how the Data Incident occurred, "how and when the breach was identified, what security measures [TransUnion] had in place, and what steps were taken after the data breach was discovered." *In re 23andMe, Inc.*, 730 F. Supp. 3d at 1353.

Given the substantial factual congruence among the Actions, it is inevitable that the parties will seek to depose the same witnesses, review identical documents, negotiate the same protective orders, and assert overlapping privileges in each proceeding. *See In re Pilot Flying J Fuel Rebate Cont. Litig.*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) ("Centralization will avoid repetitive depositions of [defendant's] officers and employees and duplicative document

discovery regarding the alleged scheme."). Transfer and coordination will eliminate these duplicative efforts, and conserve time, effort, and expense.

*Second*, centralization will "prevent inconsistent pretrial rulings, including with respect to class certification" if the Actions proceed separately. *In re Blackbaud, Inc.*, 509 F. Supp. 3d at 1364. Each Action seeks certification of a nationwide class of individuals affected by the Data Incident, with some also seeking California subclasses. The allegations are uniform, TransUnion's defenses will be virtually identical, and discovery—along with any attendant disputes—will be duplicative across all Actions. It is therefore imperative that discovery disputes, dispositive motions, and class certification issues be resolved in a single forum, rather than by multiple courts presiding over the same putative class. *See In re Digit. Advert. Antitrust Litig.*, 555 F. Supp. 3d 1372, 1375 (J.P.M.L. 2021) (centralization was necessary to avoid "the risk of inconsistent rulings on pretrial matters, particularly on discovery disputes, *Daubert* issues, and dispositive motions").

The procedural posture of the Actions, which are all in their infancy, also supports consolidation. *In re Schnuck Mkts., Inc.*, 978 F. Supp. 2d at 1381 (concluding "centralization is most appropriate now," at early stage where data breach affected millions of customers, before "additional tag-along actions also may be filed in this litigation"). To date, no discovery has been propounded, and no responsive pleadings have been filed. No party has been forced to incur the costs and expend the efforts to propound discovery or engage in motion practice in an Action. The Panel should intervene at this early stage to transfer the Actions pursuant to Section 1407 before additional actions are filed.

Accordingly, the second factor weighs decisively in favor of pretrial centralization under Section 1407.

(c) *A TransUnion-Specific MDL Will Serve the Convenience of the Parties.*

Transfer will unquestionably promote the convenience of both the parties and witnesses. As noted above, plaintiffs in the Actions will inevitably seek overlapping discovery from TransUnion regarding the Data Incident and will pursue depositions of the same fact witnesses and experts. Likewise, TransUnion will almost certainly advance similar dispositive motions across the Actions, and the parties will present substantially identical arguments for and against class certification. Thus, transfer will streamline discovery and motion practice in the Actions, "ensur[ing] . . . the just and expeditious resolution of [the] actions to the overall benefit of the parties." *In re H & R Block Mortg. Corp. Prescreening Litig.*, 435 F. Supp. 2d 1347, 1349 (J.P.M.L. 2006) (coordinating three class actions to "ensure[] that pretrial proceedings will be conducted in a streamlined manner").

Accordingly, the third factor also weighs in favor of centralization.

2. <u>A TransUnion-Specific MDL Proceeding Would Better Serve the Purposes of § 1407 Than the MDL Proceeding Requested in the *Salesforce* Motion or Informal Coordination.</u>

As detailed in TransUnion's response in opposition to the *Salesforce* Motion, centralization in a TransUnion-specific MDL proceeding would better serve the convenience of the parties and witnesses and the purposes of Section 1407 than the MDL proceeding proposed in the *Salesforce* Motion or informal coordination.[8] Although several complaints name TransUnion and other parties as defendants, plaintiffs' allegations in those cases make clear that TransUnion suffered from a *distinct* incident that occurred on a different date and time than the

---

[8] *See* TransUnion's Opposition to Plaintiffs' Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407, *In re Salesforce, Inc. Data Sec. Breach Litig.*, MDL No. 3164 (J.P.M.L. filed Oct. 3, 2025), Dkt. No. forthcoming.

12

incidents alleged against other defendants named in the *Salesforce* Motion.[9] Noticeably absent from the complaints are allegations that Salesforce—the supposed "hub" of the data incidents—was breached through a single security vulnerability.[10] The Panel has repeatedly expressed its "reluctance to centralize actions against different defendants in one MDL," particularly where (like here), the cases present numerous "[defendant]-specific and plaintiff-specific issues." *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d 1365, 1366-67 (J.P.M.L. 2019). An MDL comprised of at least six defendants that experienced their own, separate data incident, at different times, through different vectors, and involving different data does not serve the purposes of Section 1407—it contravenes these purposes. The opposition to the *Salesforce* Motion by both plaintiffs and defendants-alike demonstrates that the *Salesforce* Motion requests an inefficient and inconvenient coordination of proceedings.

Conversely, the Panel has emphasized the superiority of defendant-specific MDLs as opposed to MDLs comprised of separate defendants with a single factual common thread. For example, in *In re National Ski Pass Insurance Litigation*, 492 F. Supp. 3d 1352 (J.P.M.L. 2020), the Panel denied a motion to centralize seven actions pending against several different defendants, holding that "few efficiencies would be gained by creating an industry-wide MDL that combines claims against the USIC and Arch defendants," noting that the Panel views requests to centralize claims filed against "multiple" defendants "with a skeptical eye." *Id*. at 1353. The Panel "d[id] find merit however in the parties' request for the creation of defendant-specific MDLs" given that the defendant-specific MDLs would "eliminate duplicative discovery; avoid inconsistent pretrial rulings, particularly on class certification; and conserve the resources

---

[9]     *Id.*, Argument § I.A.

[10]     *Id.*

of the parties, their counsel and the judiciary." *Id*. at 1354. Likewise, in *In re Power Morcellator Products Liability Litigation*, 140 F. Supp. 3d 1351 (J.P.M.L. 2015), the Panel held that defendant-wide centralization was "not appropriate" because the "individual issues" in the claims against different defendants "will predominate over the common issues." *Id*. at 1353. Nevertheless, the Panel granted centralization for the cases involving one defendant, Ethicon, given that there were "now at least 28 actions naming Ethicon as a defendant." *Id*. The Panel took this approach in response to the numerous cases filed nationwide against various defendants alleging violations of the Home Affordable Modification Program, centralizing cases by defendant as opposed to creating a single, defendant-wide MDL. *See In re JPMorgan Chase Mortg. Modification Litig.*, 818 F. Supp. 2d 1378, 1379 (J.P.M.L. 2011); *In re CitiMortgage, Inc., Home Affordable Modification Program (HAMP) Cont. Litig.*, 816 F. Supp. 2d 1375, 1376 (J.P.M.L. 2011); *In re Bank of Am. Home Affordable Modification Program (HAMP) Cont. Litig.*, 746 F. Supp. 2d 1359, 1361 (J.P.M.L. 2010). Here, a TransUnion-specific MDL for the TransUnion Actions is superior to the defendant-wide MDL proposed in the *Salesforce* Motion and, as detailed above, satisfies all of the factors under Section 1407.

Moreover, centralization under 28 U.S.C. § 1407 is far preferable to informal coordination. Currently, there are 54 cases pending across five districts, involving more than 36 distinct groups of plaintiffs' firms—a number that is expected to increase. The Panel has recognized that "informal coordination is not practicable" when there are that many cases and plaintiffs' firms involved. *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014) (motion involving "21 constituent actions and over 30 potential tag-along actions" and "two dozen involved plaintiffs' firms" with the "considerable growth in the litigation over the past few months" made "effective informal coordination of discovery and

14

other pretrial matters unlikely"); *In re Eliquis (Apixaban) Prods. Liab. Litig.*, 282 F. Supp. 3d 1354, 1355-56 (J.P.M.L. 2017) (holding that "informal coordination [wa]s not an efficient alternative to centralization" where there were "53 actions pending in 17 districts raising substantially the same factual and legal issues . . . and over a dozen involved plaintiffs' firms"); *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, 224 F. Supp. 3d 1330, 1331 (J.P.M.L. 2016) (informal coordination not feasible in motion involving 10 cases, noting that "the number of involved plaintiffs' firms has increased with the number of actions, posing a further impediment to informal coordination").

In short, centralizing the TransUnion Actions in the Northern District of Illinois is unquestionably convenient for the parties and witnesses, and superior to both the MDL proposed in the *Salesforce* Motion and informal coordination.

**B.      The Panel Should Separate and Remand the Claims Against Other Defendants in the Nine Cases Naming Multiple Defendants.**

While there are nine complaints naming TransUnion in addition to other defendants,[11] the Panel "may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded." 28 U.S.C. § 1407(a). In *In re Invokana (Canagliflozin) Products Liability Litigation*, 223 F. Supp. 3d 1345 (J.P.M.L. 2016), for example, a group of plaintiffs sought to centralize 55 actions alleging injuries caused by a class of medicines manufactured by three different pharmaceutical companies that were named as defendants in these actions. *Id*. at 1347-48. One defendant manufactured Invokana and Invokamet, while two separate defendants manufactured Farxiga and Jardiance, respectively. *Id*. Three cases involved more than one of the manufacturers, the "combination cases." *Id*. The

---

[11]     The nine cases naming another defendant or defendants are listed in Exhibit A to the Schedule of Actions.

Panel declined to order multi-defendant centralization and, instead, ordered that the actions relating to Invokana and Invokamet (manufactured by the same defendant) be centralized. *Id*. at 1348. Critically, the Panel also ordered that the claims against other defendants in the three "combination cases" be separated and remanded back to their transferor courts. *Id.*; *see also In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d 1376, 1378-79 (J.P.M.L. 2006) (ordering MDL only as to defendant AstraZeneca and separating and remanding claims against non-AstraZeneca defendants back to their respective transferor courts); *In re Celexa & Lexapro Prods. Liab. Litig.*, 416 F. Supp. 2d 1361, 1363 (J.P.M.L. 2006) (concluding that "claims against Wyeth involving a prescription drug other than Celexa or Lexapro . . . d[id] not share sufficient questions of fact with claims against Forest regarding its drugs to warrant inclusion of the claims against Wyeth in the MDL-1736 proceedings," and ordering separation/remand of those claims); *In re Aredia & Zometa Prods. Liab. Litig.*, 429 F. Supp. 2d 1371, 1372-73 (J.P.M.L. 2006) (separating and remanding claims in three actions brought against Merck and transferring for inclusion in the MDL only claims against Novartis).

The same result is warranted here: the claims against other defendants in the actions naming TransUnion and other defendants, including the claims asserted against Salesforce, can be separated and remanded back to their transferor courts, leaving the claims against TransUnion to proceed in the Northern District of Illinois. The Salesforce claims can then be transferred to a Salesforce-specific MDL proceeding, if one is created.

**C.     The Northern District of Illinois Is the Appropriate Transferee Forum.**

When selecting a transferee forum for multidistrict litigation, the Panel evaluates several key factors: (i) the district where the largest number of cases is pending; (ii) the location where the common facts arose; (iii) the district that will minimize cost and inconvenience for the parties and witnesses; and (iv) the experience, skill, and caseloads of the available judges. *Manual for*

*Complex Litigation* § 20.131 (4th ed. 2004). Under these criteria, the Northern District of Illinois emerges as the most suitable forum for the transfer and centralization of the TransUnion Actions.

*First*, 43 of the currently pending 54 cases against TransUnion—the vast majority—have been filed in the Northern District of Illinois.[12] *See In re DirecTV, Inc.*, *Early Cancellation Fee Mktg. & Sales Pracs. Litig.*, 655 F. Supp. 2d 1369, 1370 (J.P.M.L. 2009) (situating MDL in district court where four actions were already pending).

*Second*, as set forth *supra*, the Northern District of Illinois is also where TransUnion is headquartered and, thus, any discovery relating to these Actions will likely require participation from TransUnion's Illinois-based employees. *In re Tepezza Mktg., Sales Pracs., & Prods. Liab. Litig.*, 677 F. Supp. 3d 1368, 1369 (J.P.M.L. 2023) (centralizing in the Northern District of Illinois because "[d]efendant Horizon is based in this convenient and readily accessible district, where likely relevant documents and witnesses may be found" and "[t]he first-filed action in this litigation is pending in this district, and far more actions are pending [there] than any other district").

*Third*, "the Panel has often acknowledged that Chicago's central location commends transfer to the Northern District of Illinois when a litigation is nationwide in scope." *In re Corrugated Container Antitrust Litig.*, 441 F. Supp. 921, 924 (J.P.M.L. 1977); *In re "Factor VIII or IX Concentrate Blood Prods." Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) ("Chicago is a geographically central location for this nationwide litigation."). In addition, in this case in particular, several of the firms representing plaintiffs, and certain of TransUnion's

---

[12]  Counsel for plaintiffs in the *Snelgrove* action filed a motion to reassign the cases pending against TransUnion to a single judge in the U.S. District Court for the Northern District of Illinois. *See* Minute Entry, *Snelgrove v. TransUnion, LLC*, No. 1:25-cv-10320 (N.D. Ill. Sept. 12, 2025), Dkt. No. 10. That motion was denied without prejudice and with leave to refile. *Id.* While plaintiffs have not refiled that motion, they have indicated that they intend to do so.

17

counsel are located in Chicago. It would thus be convenient and cost-efficient for the parties and counsel to litigate a coordinated proceeding in Chicago.

*Fourth*, the Northern District of Illinois is well-equipped to handle complex multidistrict litigation. It has a history of efficiently managing MDLs and is staffed by experienced jurists. *See In re Wireless Tels. 911 Calls Litig.*, 259 F. Supp. 2d 1372, 1374 (J.P.M.L. 2003) (transferring to the Northern District of Illinois because "the Illinois court possesses the necessary resources to be able to devote the time and effort to pretrial matters that this docket is likely to require"). The judges currently assigned to the TransUnion Actions[13] are capable and, in some instances, have not yet presided over an MDL—a factor the Panel has previously considered favorably when selecting transferee judges. The district's resources and judicial expertise ensure that the litigation will be managed effectively. *In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d 1357, 1361 (J.P.M.L. 2019); *In re Stryker Orthopaedics LFIT V40 Femoral Head Prods. Liab. Litig.*, 249 F. Supp. 3d 1353, 1356 (J.P.M.L. 2017) (same).

In sum, all relevant factors considered by the Panel strongly support transferring and centralizing the TransUnion Actions in the Northern District of Illinois.

---

[13] The Judges currently presiding over the Actions in the Northern District of Illinois are as follows: Judge Franklin U. Valderrama (3 cases); Judge Manish S. Shah (2 cases); Judge Steve C. Seeger (2 cases); Judge Thomas M. Durkin (2 cases); Judge Edmond E. Chang (2 cases); Robert W. Gettleman (2 cases); Jeffrey I. Cummings (3 cases); Judge Jorge L. Alonso (2 cases); Judge Sara L. Ellis (2 cases); Judge LaShonda A. Hunt (2 cases); Judge John Robert Blakey (2 cases); Judge Matthew F. Kennelly (1 case); Judge Sharon Johnson Coleman (1 case); Judge Andrea R. Wood (4 cases); Georgia N. Alexakis (2 cases); Judge Martha M. Pacold (2 cases); Judge April M. Perry (1 case); Judge Sara L. Ellis (2 cases); Judge Jeremy C. Daniel (2 cases); Judge John J. Tharp, Jr. (2 cases); Judge Rebecca R. Pallmeyer (2 cases); Judge Joan H. Lefkow (1 case); Judge Lindsey C. Jenkins (1 case).

**CONCLUSION**

TransUnion respectfully asks that the Panel grant its motion to transfer the TransUnion Actions, as well as any future tag-along actions, to the Northern District of Illinois for consolidated or coordinated pretrial proceedings under 28 U.S.C. § 1407.

Dated: October 3, 2025

        */s/ Michael W. McTigue Jr.*
        Michael W. McTigue Jr.
        Meredith C. Slawe
        **SKADDEN, ARPS, SLATE, MEAGHER**
         **& FLOM LLP**
        One Manhattan West
        New York, NY 10001
        Telephone: (212) 735-3000
        michael.mctigue@skadden.com
        meredith.slawe@skadden.com

        William E. Ridgway
        **SKADDEN, ARPS, SLATE, MEAGHER**
         **& FLOM LLP**
        320 South Canal
        Chicago, IL 60606
        Telephone: (312) 407-0700
        william.ridgway@skadden.com

        *Counsel for Defendants Trans Union, LLC and TransUnion*